IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION<br><br>   Plaintiffs,<br><br>   v.<br><br>LIBERTAS COPPER, LLC, d/b/a HUSSEY COPPER,<br><br>   Defendant. | Civil Action No. 2:21-cv-1016 |

**COMPLAINT**

The United States of America ("United States"), by authority of the Attorney General of the United States and on behalf of the U.S. Environmental Protection Agency ("EPA"), and the Commonwealth of Pennsylvania, Department of Environmental Protection ("PADEP" or the "Department"), (collectively, "Plaintiffs") file this Complaint and allege as follows:

**INTRODUCTION**

1. This is a civil action brought pursuant to Sections 309(b) and (d) of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1319(b) and (d), and Sections 601 and 605 of the Pennsylvania Clean Streams Law ("PCSL"), 35 Pa. Cons. Stat. §§ 691.601 and 691.605. Defendant Libertas Copper, LLC, d/b/a Hussey Copper ("Libertas Copper" or "Defendant") has violated the CWA and the PCSL by discharging pollutants to the Ohio River without a permit, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Sections 301 and 307 of the PCSL, 35 Pa. Cons. Stat. §§ 691.301 and 691.307, and by violating the conditions and limitations of National Pollutant Discharge Elimination System

1

("NPDES") permit PA0000566 issued to Defendant by PADEP pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), and Section 307 of the PCSL, 35 Pa. Cons. Stat.. § 691.307.

2. Plaintiffs seek permanent injunctive relief and the assessment of civil penalties against Defendant to address its illegal discharges of pollutants, as authorized by Sections 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), and Sections 601 and 605 of the PCSL, 35 Pa. Cons. Stat. §§ 691.601 and 691.605.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action under Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), and under 28 U.S.C. §§ 1331, 1345, 1355, and 1367.

4. This Court has supplemental jurisdiction over the PADEP state law claims alleged herein pursuant to 28 U.S.C. § 1367(a) because the state claims are so related to the federal claims as to form part of the same case or controversy.

5. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a), as well as Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), because it is the judicial district in which Defendant is doing business and in which the violations alleged in the Complaint occurred.

6. As signatory of this Complaint, PADEP has actual notice of commencement of this action as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## DEFENDANT

7. Libertas Copper is a Delaware Limited Liability Company that owns and operates a copper smelting facility ("Facility") with its principal place of business at 100 Washington Street, Leetsdale, Pennsylvania 15056.

## STATUTORY AND REGULATORY BACKGROUND

### Clean Water Act

8. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person," to waters of the United States, except, *inter alia*, in compliance with an NPDES permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

9. Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

10. Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, *inter alia*, chemical and industrial waste.

11. Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" to mean "the waters of the United States, including the territorial seas."

12. "Waters of the United States" has been defined to include, *inter alia*, "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce . . . ." *See, e.g.*, 40 C.F.R. § 122.2 (1993); 40 C.F.R. § 120.2 (2020).

13. Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."

14. Section 402 of the CWA, 33 U.S.C. § 1342, provides that the permit-issuing authority may issue an NPDES permit that authorizes the discharge of any pollutant to waters of the United States, upon the condition that such discharge will meet all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

15. At all relevant times, PADEP has been authorized by EPA pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), to administer an NPDES permit program for regulating the discharges of pollutants to navigable waters within the jurisdiction of the Commonwealth.

16. Section 402(a)(2) of the CWA, 33 U.S.C. § 1342(a)(2), directs the Administrator to prescribe conditions and limitations, including effluent limitations, for NPDES permits to assure compliance with the requirements of the CWA. 33 U.S.C. § 1342(a)(2); *see also* 33 U.S.C. § 1311. Effluent limitations, as defined in Section 502(11) of the CWA, 33 U.S.C. § 1362(11), are restrictions on quantity, rate, and concentration of chemical, physical, biological, and other constituents that are discharged from point sources. Pursuant to Section 402(a)(2), the regulatory authority may prescribe such conditions and limitations.

17. Section 301(b) of the CWA, 33 U.S.C. § 1311(b), directs the Administrator to set effluent limitations for categories and classes of point sources based on the best practicable control technology or the best available technology economically achievable for such category or class. In 1983, EPA set effluent limitations guidelines ("ELGs") for discharges from copper-forming point sources. 48 Fed. Reg. 36,942 (Aug. 15, 1983). EPA amended the regulation in 1986. *See* 40 C.F.R. Part 468; 51 Fed. Reg. 7,568 (Mar. 5, 1986). In 1985, EPA set ELGs for the metal molding and casting industry. *See* 40 C.F.R. Part 464; 50 Fed. Reg. 45,212 (Oct. 30, 1985). The ELGs prescribe "maximum for any 1 day" and "maximum for monthly average" numeric effluent limitations for copper, chromium, nickel, oil and grease, lead, total suspended solids ("TSS"), pH, and zinc. Discharges with a pH above or below the range set forth in the applicable ELGs (within the range of 7.5 to 10.0 at all times) are violations of the daily maximum or daily minimum limitations in Defendant's NPDES permit. Pursuant to Section 301(b), the regulatory authority may set such effluent limitations.

18.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes civil actions for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or violates any permit condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

19.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates any permit condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty payable to the United States of up to $25,000 per day for each violation.

20.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note (as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note); the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note; and 40 C.F.R. § 19.4 (Feb. 6, 2019), EPA may seek civil penalties of up to $37,500 per day for each violation that occurred between January 12, 2009, and November 2, 2015, and up to $54,833 per day for each violation that occurred after November 2, 2015.

21.     The U.S. Attorney General and the Department of Justice have authority to bring this action on behalf of EPA pursuant to Section 506 of the CWA, 33 U.S.C. § 1366.

Pennsylvania Clean Streams Law and Regulations

22.     Sections 301 and 307 of the PCSL, 35 Pa. Cons. Stat. §§ 691.301 and 691.307, prohibit the discharge by any person of any industrial wastes into waters of the Commonwealth of Pennsylvania, except, *inter alia*, in compliance with a permit issued by PADEP pursuant to Section 307 of the PCSL, 35 Pa. Cons. Stat. § 691.307, and PADEP's implementing regulations adopted by the Pennsylvania Environmental Quality Board ("EQB"). *See* 25 Pa. Code Chapters 91, 92a, 93, 95, and 96.

23. Section 92a.9 of the regulations adopted by the Pennsylvania EQB, 25 Pa. Code § 92a.9, provides that an NPDES Permit satisfies the permit requirement of Section 307 of the PCSL, 35 Pa. Cons. Stat. § 691.307.

24. Section 95.2(2)(i) of the regulations adopted by the Pennsylvania EQB provides that "[a]t no time [may oil-bearing wastewaters] cause a film or sheen upon or discoloration of the waters of this Commonwealth or adjoining shoreline." 25 Pa. Code § 95.2(2)(i).

25. Under Section 307(c) of the PCSL, a discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to PADEP's regulations constitutes a statutory nuisance. 35 Pa. Cons. Stat. § 691.307(c).

26. Under Section 3 of the PCSL, a discharge of industrial wastes or any substance into the waters of the Commonwealth, which constitutes or contributes to pollution or creates a danger of pollution is a public nuisance. 35 Pa. Cons. Stat. § 691.3.

27. Under Section 1 of the PCSL, "pollution" means the contamination of any waters of the Commonwealth that is likely to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including, but not limited to such contamination by the discharge of any substances into such waters. 35 Pa. Cons. Stat. § 691.1.

28. Section 601 of the PCSL, 35 Pa. Cons. Stat. § 691.601, provides in pertinent part: "Any activity or condition declared by this act to be a nuisance or which is otherwise in violation of this act, shall be abatable in the manner provided by law or equity for the abatement of public nuisances."

29. Section 611 of the PCSL, 35 Pa. Cons. Stat. § 691.611, provides in pertinent part:

> It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, [or] to cause air or water pollution . . . . Any person or municipality engaging in such conduct shall be subject to the provisions of Sections 601, 602 and 605.

30. Section 605 of the PCSL, 35 Pa. Cons. Stat. § 691.605, provides in pertinent part:

> In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act, rule, regulation, order of the department, or a condition of any permit issued pursuant to this act, the department, after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was willful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation.

## GENERAL ALLEGATIONS

### Defendant's Operations and the Facility

31. Defendant owns and operates its Facility at 100 Washington Street, Leetsdale, Pennsylvania, where it engages in copper melting, casting, and rolling.

32. Defendant was formed in November 2011 when Patriarch Partners, LLC, a private equity firm, acquired substantially all assets of Hussey Copper, Ltd. ("Hussey Copper"), including the Facility, out of bankruptcy. Defendant's acquisition of Hussey Copper closed on December 15, 2011. Following the acquisition, Hussey Copper continued to operate under the name HCL Liquidation Ltd. until on or about August 1, 2016, when a Certificate of Cancellation of Limited Partnership was filed with the Commonwealth of Pennsylvania's Bureau of Corporations.

33. Defendant has owned and operated the Facility since acquiring Hussey Copper.

34. Outfall 001 is a 30-inch-diameter concrete pipe from which wastewater and runoff is discharged to the Ohio River. Outfall 001 receives storm water from the northern side

of the Facility, non-contact cooling water, and treated process water from Internal Monitoring Point 101. Outfall 001 is a point source within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14), and Section 92a.2 of PADEP's regulations, 25 Pa. Code § 92a.2.

35. Internal Monitoring Point 101 discharges treated process wastewater from Defendant's copper production lines, including its direct chill casters, annealing furnaces, cleaning lines, and hot rolling mill, after the wastewater has been treated at Defendant's onsite waste treatment plant. As provided for in 40 C.F.R. § 122.45(h), to ensure compliance with the applicable ELGs, effluent limitations have been imposed on this internal waste stream because it is impractical or infeasible to impose these effluent limitations at the point of discharge (*i.e.*, Outfall 001), where this stream is mixed with other waste streams and cooling water streams, thereby diluting the wastewater. Certain pollutants, such as copper, are monitored at both Internal Monitoring Point 101 and Outfall 001 because they occur in multiple waste streams that are commingled at Outfall 001.

36. At all times relevant to this Complaint, Defendant discharged wastewater and storm water that contained various "pollutants," as that term is defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6), and 40 C.F.R. § 122.2, and Section 92a.2 of PADEP's regulations, 25 Pa. Code § 92a.2, to the Ohio River. These pollutants include copper, chromium, nickel, oil and grease, lead, pH, TSS, and zinc. *See* Appendix A.

37. At all times relevant to this Complaint, Defendant discharged wastewater, oil-bearing wastewater, and storm water associated with industrial activity, all of which constitute "industrial waste" as that term is defined by Section 1 of the PCSL, 35 Pa. Cons. Stat. § 691.1, to the Ohio River.

38. The Ohio River is a "navigable water" as that term is defined in CWA Section 502(7), 33 U.S.C. § 1362(7), and a "water of the Commonwealth" as that term is defined in Section 1 of the PCSL, 35 Pa. Cons. Stat. § 691.1.

39. Defendant is a "person" as defined in CWA Section 502(5), 33 U.S.C. § 1362(5), and Section 1 of the PCSL, 35 Pa. Cons. Stat. § 691.1.

40. At all times relevant to this Complaint, Defendant has done business in the Western District of Pennsylvania.

## Permitting Background

41. From November 1, 2016, to the present, Defendant's discharges have occurred under NPDES Permit No. PA0000566.

42. Defendant's acquisition of Hussey Copper occurred on December 15, 2011. On December 16, 2011, Defendant submitted an NPDES permit transfer application to the Department. The Department was unable to transfer the permit application because the 2001 Permit was administratively extended. Therefore, from December 15, 2001, through October 31, 2016, Defendant operated the Facility without an NPDES permit issued under its name, although Defendant operated the Facility as though the 2001 Permit were still in effect.

43. From December 15, 2011, through October 31, 2016, Defendant submitted Discharge Monitoring Reports ("DMRs") to PADEP and EPA. Hussey Copper's prior permit had required these submissions on a monthly basis, based on weekly sampling of discharges, for evaluation of Hussey Copper's compliance with its effluent limitations.

## Hussey Copper's Permit Status Before Defendant's Acquisition

44. On May 25, 2001, PADEP issued NPDES Permit No. PA0000566 to Hussey Copper, effective June 1, 2001 (the "2001 Permit"). The 2001 Permit expired on May 25, 2006.

45. Hussey Copper submitted a timely NPDES permit renewal application on November 23, 2005, and submitted supplements to the application on February 28, 2006, and March 26, 2007 ("Permit Renewal Application").

46. DMRs submitted by Hussey Copper showed that it failed to comply with its effluent limitations for, *inter alia*, copper, TSS, and pH at Outfall 001 and Internal Monitoring Point 101 on multiple occasions beginning in August 2005.

47. Due to technical deficiencies in the Permit Renewal Application and Hussey Copper's continuing non-compliance with the terms of the 2001 Permit, PADEP did not renew the 2001 Permit upon submission of the Permit Renewal Application. Section 609 of the PCSL, 35 Pa. Cons. Stat. § 691.609, provides that PADEP shall not issue, renew, or amend an NPDES permit if it finds that a permit applicant has failed and continues to fail to comply with, *inter alia*, the terms of an existing NPDES permit.

48. Instead, PADEP attempted to negotiate a Consent Order and Agreement ("COA") with Hussey Copper to address alleged violations of the 2001 Permit and the PCSL and ensure future compliance with permit terms.

49. While negotiations were ongoing, PADEP administratively extended the 2001 Permit so that its terms and conditions would remain in effect until an agreement was reached and the permit was renewed.

50. On May 5, 2010, PADEP sent a draft COA to Hussey Copper with a draft NPDES permit attached. PADEP and Hussey Copper did not reach agreement on the terms of the COA, and the permit was never renewed prior to Hussey Copper's bankruptcy and acquisition.

Post-Acquisition Permitting Status

51. In conjunction with its acquisition of Hussey Copper, Defendant requested that PADEP transfer the 2001 Permit to Defendant.

52.     PADEP informed Defendant that it could not transfer an administratively extended NPDES permit to a new owner.

53.     PADEP continued to try to negotiate the COA with Defendant to address past violations at the facility and ensure future compliance with permit terms, but PADEP and Defendant were not able to reach agreement on the terms of the COA.

54.     From the time of its acquisition of Hussey Copper on December 15, 2011, until a permit was issued to Defendant on November 1, 2016, Defendant continued to operate the Facility and submit DMRs to PADEP under the terms required by the 2001 Permit.

55.     From December 15, 2011, through October 31, 2016, Defendant discharged wastewater and storm water that contained various "pollutants" as that term is defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6), and 40 C.F.R. § 122.2, and Section 92a.2 of PADEP's regulations, 25 Pa. Code § 92a.2, into the Ohio River. These pollutants include copper, chromium, nickel, oil and grease, lead, pH, TSS, and zinc.

56.     From December 15, 2011, through October 31, 2016, Defendant discharged wastewater, oil-bearing wastewater, and storm water associated with industrial activity, all of which constitute "industrial waste" as that term is defined by Section 1 of the PCSL, 35 Pa. Cons. Stat. § 691.1, to the Ohio River.

57.     Even if the terms of the 2001 Permit had been in place during the period from December 15, 2011, through October 31, 2016, Defendant discharged "pollutants," as defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6), and 40 C.F.R. § 122.2, and Section 92a.2 of PADEP's regulations, 25 Pa. Code § 92a.2, and "industrial waste" as that term is defined by Section 1 of the PCSL, 35 Pa. Cons. Stat. § 691.1, to the Ohio River during that time in excess of

the limitations established in the 2001 Permit. These pollutants include copper, chromium, nickel, oil and grease, lead, pH, TSS, and zinc. *See* Appendix A.

Violations of 2016 Permit

58. On October 21, 2016, PADEP issued Defendant NPDES Permit No. PA0000566, which became effective November 1, 2016, and expires on October 31, 2021 (the "2016 Permit"). The 2016 Permit authorizes certain discharges of pollutants to the Ohio River subject to the conditions and limitations set forth therein.

59. The 2016 Permit includes effluent limitations prohibiting discharges of specified pollutants at Outfall 001 and Internal Monitoring Point 101 in excess of numeric monthly average, daily maximum, and/or daily minimum limits.

60. Since the November 1, 2016, effective date of the 2016 Permit, Defendant has discharged pollutants in excess of the limitations established in the 2016 Permit. These pollutants include copper, pH, and TSS. *See* Appendix A.

61. Defendant reported these violations to PADEP and EPA in monthly DMRs, and it certified the accuracy of its data on each DMR.

<b>FIRST FEDERAL CLAIM FOR RELIEF</b>
Unlawful Discharges of Pollutants Without a Permit

62. Paragraphs 1–61 are realleged and incorporated herein by reference.

63. From December 2011 to October 2016, Defendant discharged pollutants to the Ohio River from a point source without obtaining an NPDES permit pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

64. Each discharge of pollutants without an NPDES permit (*i.e.*, every discharge that occurred at the Facility between December 2011 and the effective date of the 2016 Permit on November 1, 2016) constitutes a violation of Section 301 of the CWA, 33 U.S.C. § 1311.

65. Even if the terms of the 2001 Permit had been in place during the period from November 5, 2013, through October 31, 2016, Defendant exceeded effluent limitations at Outfall 001 on more than 50 occasions and effluent limitations at Internal Monitoring Point 101 on more than 120 occasions. *See* Appendix A1.

66. Even if the terms of the 2001 Permit had been in place during the period from November 5, 2013, through October 31, 2016, Defendant violated the narrative standard prohibiting discharges of oil in harmful quantities on more than 150 occasions. *See* Appendix A2.

67. Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties of up to $37,500 per day for each violation that occurred between November 5, 2013, and November 2, 2015, inclusive, and up to $54,833 per day for each violation that occurred between November 3, 2015, and October 31, 2016, inclusive.

**FIRST COMMONWEALTH CLAIM FOR RELIEF**

<u>Unlawful Discharges of Pollutants Without a Permit</u>

68. Paragraphs 1–67 are realleged and incorporated herein by reference.

69. On numerous occasions since 2014, Defendant discharged pollutants, which constitute "industrial waste" as that term is defined by Section 1 of the PCSL, 35 Pa. Cons. Stat. § 691.1, to the Ohio River without obtaining an NPDES Permit for these discharges, in violation of Sections 301 and 307 of the PCSL, 35 Pa. Cons. Stat. §§ 691.301 and 691.307.

70. The violations committed by the Defendant constitute statutory nuisances under Sections 3 and 307(c) of the PCSL, 35 Pa. Cons. Stat. §§ 691.3 and 691.307(c), public nuisances, and unlawful conduct under Section 611 of the PCSL, 35 Pa. Cons. Stat. § 691.611.

71. Pursuant to Section 605 of the PCSL, 35 Pa. Cons. Stat. § 691.605, Defendant is liable for civil penalties of up to $10,000 per day for each such violation.

## SECOND FEDERAL CLAIM FOR RELIEF

<u>Violations of NPDES Permit – November 2016 to Present</u>

72. Paragraphs 1–71 are realleged and incorporated herein by reference.

73. From November 1, 2016, to the present, Defendant's operation of the Facility has been subject to the requirements of the 2016 Permit.

74. The 2016 Permit contains effluent limitations for multiple pollutants, including copper, oil and grease, pH, and TSS.

75. From November 1, 2016, to the present, Defendant has exceeded the effluent limitations at Internal Monitoring Point 101 on more than 30 occasions. Defendant has exceeded the effluent limitations at Outfall 001 on more than 20 occasions. *See* Appendix B1.

76. Part A, Additional Requirements #2 of the 2016 Permit prohibits discharges of oil and grease in amounts that cause a film or sheen upon or discoloration of the receiving waters.

77. From November 1, 2016, to the present, Defendant has discharged oil from Outfalls 001 and 002 in an amount that created a sheen upon the receiving water on more than 120 occasions. *See* Appendix B2.

78. Unless enjoined, Defendant's violations will continue.

79. Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), Defendant is liable for permanent injunctive relief.

80. Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, Defendant is liable for civil penalties of up to $54,833 per day for each violation that occurred on or after November 1, 2016.

## SECOND COMMONWEALTH CLAIM FOR RELIEF

<u>Violation of NPDES Permit – November 2016 to Present</u>

81. Paragraphs 1–80 are realleged and incorporated herein by reference.

82. On numerous occasions beginning in November 2016, Defendant discharged pollutants and industrial waste in excess of and in violation of the effluent limitations set for Outfall 001 and Internal Monitoring Point 101 in the 2016 Permit.

83. On numerous occasions beginning in November 2016, Defendant discharged oil in violation of the prohibition on oil discharges that cause a sheen upon receiving waters in the 2016 Permit.

84. The violations committed by the Defendant constitute statutory nuisances under Sections 3 and 307(c) of the PCSL, 35 Pa. Cons. Stat. §§ 691.3 and 691.307(c), public nuisances, and unlawful conduct under Section 611 of the PCSL, 35 Pa. Cons. Stat. § 691.611.

85. Defendant will continue to violate its 2016 Permit and will therefore continue to violate Section 307 of the PCSL, 35 Pa. Cons. Stat. § 691.307, in this manner, unless enjoined by the Court.

86. Pursuant to Section 601 of the PCSL, 35 Pa. Cons. Stat. § 691.601, Defendant is liable for permanent injunctive relief.

87. Pursuant to Section 605 of the PCSL, 35 Pa. Cons. Stat. § 691.605, Defendant is liable for civil penalties of up to $10,000 per day for each such violation.

## THIRD COMMONWEALTH CLAIM FOR RELIEF

<u>Violations of PCSL and PADEP Regulations – Oil Sheens</u>

88. Paragraphs 1–87 are realleged and incorporated herein by reference.

89. On numerous occasions since 2014, Defendant discharged oil-bearing wastewaters from Outfalls 001 and 002 that caused a sheen in the Ohio River on more than 270 occasions. *See* Appendices A2, B2.

90. On numerous occasions as listed in Appendices A2 and B2, since 2014, Defendant discharged oil that caused a sheen upon receiving waters in violation of Section 95.2(2)(i) of PADEP's regulations, 25 Pa. Code § 95.2(2)(i).

91. The violations committed by the Defendant constitute pollution or create a danger of pollution, constitute statutory nuisances under Sections 3 and 401 of the PCSL, 35 Pa. Cons. Stat. §§ 691.3 and 691.401, constitute public nuisances, and constitute unlawful conduct under Section 611 of the PCSL, 35 Pa. Cons. Stat. § 691.611.

92. Defendant will continue to violate Section 95.2(2)(i) of PADEP's regulations, 25 Pa. Code § 95.2(2)(i), and will therefore continue to violate Section 611 of the PCSL, 35 Pa. Cons. Stat. § 691.611, in this manner, unless enjoined by the Court.

93. Pursuant to Section 601 of the PCSL, 35 Pa. Cons. Stat. § 691.601, Defendant is liable for permanent injunctive relief.

94. Pursuant to Section 605 of the PCSL, 35 Pa. Cons. Stat. § 691.605, Defendant is liable for civil penalties of up to $10,000 per day for each such violation.

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America and PADEP respectfully request that this Court:

A. Permanently enjoin Defendant from discharging pollutants except as expressly authorized by the CWA, the PCSL, and the limitations and conditions of its NPDES permit;

B. Order Defendant to take all necessary steps to comply with the CWA, the PCSL, PADEP's regulations, and the limitations and conditions of Defendant's 2016 Permit;

C. Assess civil penalties against Defendant of up to $37,500 per day for each violation of the CWA that occurred between November 5, 2013, and November 2, 2015, and up to $54,833 per day for each violation of the CWA that occurred after November 2, 2015;

D. Assess civil penalties against Defendant of up to $10,000 per day for each violation of the PCSL and the 2016 Permit.

E. Award the Commonwealth of Pennsylvania its costs and fees of this action, and

F. Grant such other relief as the Court may deem appropriate.

Respectfully submitted,

FOR THE UNITED STATES

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

/s/ Vanessa M. Moore
VANESSA M. MOORE
DC Bar No. 1617837
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3900
Email: vanessa.moore@usdoj.gov

STEPHEN R. KAUFMAN
Acting United States Attorney
Western District of Pennsylvania

/s/ Paul E. Skirtich
PAUL E. SKIRTICH
Assistant U.S. Attorney
Western District of Pennsylvania
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

(412) 894-7418
PA ID No. 30440

FOR THE PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

/s/ Melanie B. Seigel
MELANIE B. SEIGEL
Assistant Counsel
Office of Chief Counsel, Southwest Region
400 Waterfront Drive
Pittsburgh, PA 15222
Phone: 412.442.4262
Fax: 412.442.4274
Email: mseigel@pa.gov
PA ID No. 315847